UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **RORY DIMES** | **CIVIL ACTION** |
| **VERSUS** | **NO. 19-13712** |
| **ROBERT C. TANNER, WARDEN** | **SECTION: "A"(1)** |

### REPORT AND RECOMMENDATION

Petitioner, Rory Dimes, a Louisiana state prisoner, filed this federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254.  For the following reasons, it is recommended that his application be **DISMISSED WITH PREJUDICE**.

On September 22, 2014, petitioner was convicted of possession of a firearm by a convicted felon, possession with the intent to distribute heroin, and possession of oxycodone.[1]  On October 3, 2014, he was sentenced on those convictions as follows:  twenty years without benefit of probation, parole, or suspension of sentence on the firearm conviction; fifty years without benefit of probation or suspension of sentence on the heroin conviction; and five years on the oxycodone conviction.  It was ordered that his sentences be served concurrently.[2]  However, on January 13, 2015, he then pleaded guilty to being a fourth offender and was resentenced as such on the oxycodone conviction to a concurrent term of forty years imprisonment.[3]  After he was granted an out-of-time appeal,[4] the Louisiana Fourth Circuit Court of Appeal affirmed his convictions and

---

[1] State Rec., Vol. 4 of 6, transcript of September 22, 2014, pp. 155-56; State Rec., Vol. 1 of 6, minute entry dated September 22, 2014.
[2] State Rec., Vol. 4 of 6, transcript of October 3, 2014; State Rec., Vol. 1 of 6, minute entry dated October 3, 2014.
[3] State Rec., Vol. 4 of 6, transcript of January 13, 2015, pp. 24-31; State Rec., Vol. 1 of 6, minute entry dated January 13, 2015; State Rec., Vol. 2 of 6, guilty plea form.
[4] State Rec., Vol. 2 of 6, Judgment dated September 10, 2015.

sentences on June 22, 2016,[5] and the Louisiana Supreme Court denied his related writ application on May 26, 2017.[6]

On April 9, 2018, petitioner filed with the state district court an application for post-conviction relief claiming that he had received ineffective assistance of counsel.[7] His application was denied on April 15, 2018.[8] After various related proceedings in the state courts, the Louisiana Supreme Court ultimately likewise denied relief on October 15, 2019, stating simply: "Applicant fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[9]

Petitioner thereafter filed the instant federal habeas corpus application reasserting his ineffective assistance of counsel claims.[10] The state filed a response conceding that petitioner's application was timely and that his claims were exhausted; however, the state argues that his claims have no merit.[11] Although petitioner was afforded an opportunity to file a reply to the state's response,[12] he did not avail himself of that opportunity.

## I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible

---

[5] State v. Dimes, 195 So. 3d 1263 (La. App. 4th Cir. 2016); State Rec., Vol. 4 of 6. The Court of Appeal remanded the matter to the state district court for the limited purpose of imposition of the mandatory fine as to the firearm conviction.
[6] State v. Dimes, 221 So. 3d 80 (La. 2017); State Rec., Vol. 4 of 6.
[7] State Rec., Vol. 1 of 6.
[8] State Rec., Vol. 1 of 6, Judgment dated April 15, 2018.
[9] State v. Dimes, 280 So. 3d 583 (La. 2019); State Rec., Vol. 6 of 6.
[10] Rec. Doc. 4.
[11] Rec. Doc. 18.
[12] See Rec. Doc. 7, p. 2.

under law." Bell v. Cone, 535 U.S. 685, 693 (2002); accord Langley v. Prince, 926 F.3d 145, 155 (5th Cir. 2019) (noting that the AEDPA imposes a "relitigation bar" on claims adjudicated on the merits by the state court), cert. denied, 140 S. Ct. 2676 (2020). The applicable standards of review are now as follows.

As to pure questions of fact, factual findings are presumed to be correct and a federal court must give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially

> indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (footnotes, internal quotation marks, ellipses, and brackets omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 572 U.S. 415, 426 (2014). However, a federal habeas court must be mindful that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694; accord Harrington v. Richter, 562 U.S. 86, 102-03 (2011) ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." (quotation marks omitted)); Langley, 926 F.3d at 156 ("The Supreme Court has repeatedly held that it is not enough to show the state court was wrong."); Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). Therefore:

> "[T]he [AEDPA's] relitigation bar forecloses relief unless the prisoner can show the state court was *so* wrong that the error was well understood and comprehended in existing law beyond any possibility for fairminded disagreement. In other words, the unreasonable-application exception asks whether it is beyond the realm of possibility that a fairminded jurist could agree with the state court.

Langley, 926 F.3d at 156 (citations and quotation marks omitted). "Under AEDPA's relitigation bar, the very existence of reasonable disagreement forecloses relief." Id. at 170.

4

Further, the Supreme Court has expressly cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.   AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Woodall, 572 U.S. at 426 (citations and quotation marks omitted).  Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).

In summary, "AEDPA prevents defendants – **and federal courts** – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Renico v. Lett, 559 U.S. 766, 779 (2010) (emphasis added).  The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein.  Woodall, 572 U.S. at 417.

## II.  Facts

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts of this case as follows:

> Probation and Parole Agent Amy Giselson testified at trial.[FN 1]   She stated that during the daytime of 24 September 2012, she performed a residence check with Agent Amy Richard at the defendant's home in conjunction with the defendant's status as a probationer.  After she and Agent Richard knocked on the door and received no answer, they began walking back to their car.  Dimes called out to Agent Giselson, and she and Agent Richard turned around to see the defendant and Penny Hicks, Dimes' girlfriend, standing in the doorway.

5

> [FN 1] Her testimony was substantially similar to her testimony at the hearing on Dimes' motion to suppress the evidence.

Dimes invited the agents into the house, and the agents walked through the residence. As the agents walked through the bedroom area, Agent Giselson observed approximately $1,900.00 in cash on the bedside nightstand. Agent Giselson testified that the defendant was unemployed at the time of this residence check. Accordingly, she asked the defendant how he obtained the money, and he responded that he won it playing dice.[FN 2] Agent Giselson stated that Dimes' response gave her reasonable suspicion to believe that he was engaged in criminal conduct because he was not supposed to be gambling.

> [FN 2] At trial, when asked whether the defendant indicated where he was playing dice, Agent Giselson responded that the defendant did not. Regarding rules for parolees, Agent Giselson explained that "[p]arolees are to refrain from engaging in criminal conduct and playing dice is gambling, which is illegal conduct." On cross-examination, when asked whether she asked the defendant whether he won the money playing dice on the streets, Agent Giselson responded, "No sir, I did not and he did not say anything about a casino and so it is reasonable for me to believe that he was engaged in criminal conduct."

Agent Giselson further testified that because she had reasonable suspicion to believe that the defendant was engaged in criminal conduct, she began a search of his residence. She opened the top drawer of the defendant's bedside nightstand and found a black semi-automatic handgun and over $25,000.00. After this discovery, she handcuffed the defendant and advised him that he was in violation of his parole for possessing a firearm. Agent Richard took control of the firearm and made it safe. The agents escorted Dimes and Ms. Hicks downstairs and notified a supervisor so that additional probation and parole officers could be dispatched to the residence. Agent Giselson stated that her supervisor gave the officers permission to search the remainder of the residence.

In her continued search of the residence, Agent Giselson searched a pair of men's pants that were on a chair near the side of the bed where the agents found the large sums of money. In the pants, which Ms. Hicks identified as the defendant's, Agent Giselson found four white pills with the imprint of "512" that she testified were later identified as oxycodone pills. She testified that Agent Richard also located a white pill imprinted with "512" on the floor between the bed and the chair. Agent Richard also found approximately seventeen grams of heroin in an oven mitt, and Agent Justin Green found methadone and a scale in the kitchen cabinet.

Agent Giselson testified that Dimes was read his <u>Miranda</u> rights.[FN 3] The defendant elected to fill out the waiver of rights form, and he also made a written statement that the drugs were his, and the firearm was for his personal protection. The agent testified that she spoke to Ms. Hicks, who also stated that the firearm, drugs, and cash were not hers.

> [FN 3]  Agent Richard testified at trial that she was present when Agent Giselson read the defendant his Miranda rights.

Probation and Parole Agent Amy Richard testified regarding her participation in Dimes' residence check and arrest.  Her testimony was substantially similar to that of Agent Giselson with regard to the search of the defendant's bedroom.  With regard to her search of the kitchen, Agent Richard stated that she began her inspection by attempting to open the kitchen cabinets, but two oven mitts were tacked on the front of the cabinets.  The mitt on the right was flat, while the mitt on the left "was kind of open making a pouch;" when she put her hand inside the mitt she "retrieved a large bag of white powder."

Agent Richard testified that she subsequently opened the kitchen cabinets and observed "various paraphernalia, a box, a little wooden box that opened up just to have little vials of things that looked l[ike] oils or chemicals."  Additionally, she stated that "[t]here were Ziploc bags that were filled with just a white substance, a powdery substance, that [she] believed was not drugs" but looked like baking soda.  She also observed Ziploc bags that were filled with Kool-Aid and a bottle of Mannitol.  Agent Richard identified the objects she found during her search of the defendant's kitchen, including two small scales and a calculator.

Kori Keaton testified as a previous detective with the project safe neighborhood for the special operations division of the New Orleans Police Department ("NOPD") that would conduct narcotics investigations.  Mr. Keaton testified that on the date of the residence check, he received a telephone call from probation and parole that one of their parolees was detained at 1918 Amelia Street, New Orleans, with a firearm and some narcotics.  He stated that he located to the residence to gather facts from the parole agents and recover evidence.  With respect to the defendant's case, Mr. Keaton testified that he recovered five white pills imprinted with "512", which "is typical of oxycodone."  He also recovered a clear plastic bag that contained what he believed was heroin, "and then it was proved positive through a NIK kit by Parole Officer Justin Green."  He also collected a bottle of Mannitol.

Mr. Keaton testified that he interviewed Dimes and asked him how long he resided at that residence, to which he replied "two to three years."  He also asked the defendant whether Ms. Hicks' children (who were not present during the residence check) were his, and he responded in the negative.  He stated that he asked the defendant whether the firearm found on the nightstand in the bedroom belonged to him, and he replied that it did, "reiterat[ing] that Ms. Hicks didn't have anything to do with the guns or the drugs."  Additionally, Mr. Keaton asked Dimes what was in the clear plastic bag, and he responded that it was heroin.  Mr. Keaton identified in open court the voluntary written statement made by the defendant, as well as the waiver of rights form.

James Huey, an employee of the Orleans Parish Sheriff's Office telecommunications department who manages the inmate phone system and is the

custodian of the phone records, also testified. Mr. Huey reviewed a call detail sheet that was generated with respect to the defendant, and a recording was played for the jury. [FN 4]

> [FN 4]  The recording is not part of the record on appeal. However, such is immaterial as it was not assigned as error. See La. C.Cr.P. art. 920.

NOPD Officer George Jackson testified as an expert in taking, examination, and comparison of fingerprints. Officer Jackson testified that the fingerprints he examined on Dimes' bill of information matched the fingerprints on the defendant's other certified packets of conviction.[13]

### III.  Petitioner's Claims

As he did in the state post-conviction proceedings, petitioner claims that his counsel was ineffective. The clearly established federal law governing such claims is Strickland v. Washington, 466 U.S. 668 (1984). In Strickland, the United States Supreme Court held:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction … has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction … resulted from a breakdown in the adversary process that renders the result unreliable.

Id. at 697.

When assessing whether counsel's performance was deficient, a federal court must always be mindful that "Strickland does not guarantee perfect representation, only a reasonably competent attorney." Harrington v. Richter, 562 U.S. 86, 110 (2011). Therefore, "[t]o establish deficient performance, a person challenging a conviction must show that counsel's representation fell below

---

[13] State v. Dimes, 195 So. 3d 1263, 1265-67 (La. App. 4th Cir. 2016); State Rec., Vol. 4 of 6.

8

an objective standard of reasonableness." Id. at 104 (quotation marks omitted). Moreover, the Supreme Court has cautioned:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

Strickland, 466 U.S. at 689 (citations and quotation marks omitted).

Strickland's prejudice component is no less exacting. The Supreme Court has explained:

> In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, Strickland asks whether it is reasonably likely the result would have been different. This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable.

Richter, 562 U.S. at 111-12 (citations and quotation marks omitted).

Where, as here, a habeas petitioner's ineffective assistance of counsel claim was denied on the merits in the state courts, he faces even greater obstacles to obtaining relief on the claim in federal court. Because such a claim presents a mixed question of law and fact, the petitioner is entitled to federal habeas relief only if he shows that the state court decision denying the claim was

"contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).

Under that deferential standard of review, the determinative factor is not simply whether counsel was ineffective in the independent view of the federal court; rather, it is "whether the state court's **application of the Strickland standard** was unreasonable." Richter, 562 U.S. at 101 (emphasis added). Therefore, "[w]hen § 2254(d) applies, the question is **not** whether counsel's actions were reasonable. **The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard**." Id. at 105 (emphasis added). That makes a petitioner's already difficult task even more so, because it requires the federal court to accord the state court decision "a deference and latitude that are not in operation when the case involves review under the Strickland standard itself." Id. at 101; see also id. at 105 ("The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so."). As a result, in effect, the federal court must "afford **both** the state court **and** the defense attorney the benefit of the doubt." Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation marks omitted).

For the following reasons, the Court finds that, under that doubly deferential standard, it cannot be said that relief is warranted with respect to either of petitioner's ineffective assistance of counsel claims.

Petitioner first claims that his counsel was ineffective for failing to argue that the evidence obtained in the residence search be suppressed "on the ground that the State presented no evidence

10

that Petitioner agreed to any [parole] conditions that restricted his rights."[14] More specifically, he faults counsel for failing "to request suppression of contraband on the ground that the state did not present parole agreement evidence at the suppression hearing to establish that Petitioner agreed in writing to a reduced expectation of privacy."[15] He opines that if counsel had specifically argued at the suppression hearing that suppression was warranted due to the state's failure to produce a **written agreement signed by petitioner**, "a reasonable probability exists that the narcotics and firearm would have ultimately been suppressed."[16] Habeas corpus relief is not warranted on that claim for the following reasons.

The record reflects that, at the time of the instant charges, petitioner was out of jail because he had been released pursuant to a diminution of sentence.[17] Under Louisiana law, some inmates "may earn, in lieu of incentive wages, a diminution of sentence by good behavior and performance of work or self-improvement activities, or both, to be known as 'good time'." La. Rev. Stat. Ann. § 15:571.3(B)(1)(a). State law further provides:

> A. When a prisoner committed to the Department of Public Safety and Corrections is released because of diminution of sentence pursuant to this Part, he shall be released **as if released on parole**.
>
> B. (1) Before any prisoner is released on parole upon diminution of sentence, he shall be issued a certificate of parole that enumerates the conditions of parole. These conditions shall be explained to the prisoner and **the prisoner shall agree in writing to such conditions prior to his release on parole.**

La. Rev. Stat. Ann. § 15:571.5 (emphasis added).

---

[14] Rec. Doc. 4-2, p. 4.
[15] Id.
[16] Id. at p. 7.
[17] See State Rec., Vol. 4 of 6, transcript of September 22, 2014, pp. 29-30.

11

In this claim, defense counsel is faulted for not requiring the prosecutor to produce a copy of the actual document petitioner signed; petitioner posits that such a document was necessary for the trial court to legitimately find that he had agreed to a reduced expectation of privacy as a condition of his release. However, even if it would perhaps have been preferable for defense counsel to have challenged the prosecutor's failure to introduce a copy of that document, petitioner has simply has not established that he was **actually prejudiced** by counsel's failure to do so.

For example, there is no reason to suspect – and, more importantly, **petitioner has not met his burden to prove** – that the prosecutor would have been unable to produce the document if he had been required to do so as a result of such an objection. Moreover, there is ample reason to believe the prosecutor could have done so. Trial testimony showed that petitioner in fact signed such a document upon his release,[18] and he does not even suggest otherwise.

Further, there is no reason to suspect – and, again, **petitioner has not met his burden to prove** – that the document he signed upon release failed to include such a condition. Besides, it can hardly be reasonably doubted that such a condition was included. Although some of the conditions imposed on a particular parolee can vary under Louisiana law,[19] a diminished expectation of privacy is part and parcel of the parole arrangement. Louisiana jurisprudence explains:

> As a result of his conviction of a crime and his agreement to allow a probation or parole officer to investigate his activities in order to confirm that he is abiding by the conditions of his release from custody, an individual on probation or parole has a reduced expectation of privacy and freedom from governmental intrusion into his affairs. State v. Malone, 403 So.2d 1234, 1238 (La. 1981); State v. Bolden, 13 So.3d [1168,] 1171 [(La. App. 5th Cir. 2009)]. This reduced expectation of privacy allows for warrantless searches of his person and residence

---

[18] Id. at p. 30.
[19] See La. Rev. Stat. Ann. 15:574.4.2(A).

> by a probation or parole officer who has reasonable suspicion to believe the person is engaging in criminal activity, with "reasonable suspicion" meaning more than a hunch, but less than probable cause. <u>State v. Malone</u>, 403 So.2d at 1239; <u>State v. Bolden</u>, 13 So.3d at 1171. "Reasonable suspicion" requires no more than that the parole officer be able to point to specific and articulable facts that, taken together with rational inferences form those facts, reasonably warrant a belief in the conclusion that a condition of parole has been or is being violated. <u>U.S. v. Scott</u>, 678 F.2d 32, 35 (5th Cir. 1982).

<u>State v. Spriggs</u>, 271 So. 3d 320, 326-27 (La. App. 5th Cir.), <u>writ denied</u>, 280 So. 3d 1173 (La. 2019).

For these reasons, petitioner has not met his burden to prove that he was prejudiced by counsel's failure in this respect. Therefore, he has not shown that the state court's denial of this ineffective assistance claim was "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Petitioner's second ineffective assistance claim is that his counsel was ineffective "where he did not challenge the trial court's motion to suppress finding that Agent Giselson's decision to open the bedside nightstand and look inside was lawful due to Petitioner's admittance to her that he obtained the money that was on top of the cabinet via 'playing dice.'"[20] Petitioner argues that because the money discovered on top of the cabinet was itself purportedly evidence of the criminal activity of which he was suspected (illegal gambling), Giselson had no right to continue searching for other evidence of his criminal activity. In its response, the state essentially argues that petitioner has it backwards: Giselson's discovery of the money did not close the door to a further search; rather, that discovery opened the door for her to search the entire residence.

---

[20] Rec. Doc. 4-2, p. 4.

The state's position does appear to be supported by the Louisiana Fourth Circuit Court of Appeal's decision on direct appeal.  In its opinion finding that the search was legal, the Court of Appeal held:

> Agent Giselson's knowledge of Dimes' admitted unemployment, together with the large sum of cash in plain view that Dimes averred was from playing dice, which was possibly a form of illegal gambling, was sufficient to establish reasonable suspicion of criminal activity, and therefore, the warrantless search of the defendant's residence was valid.[21]

Moreover, that holding appears to be consistent with the applicable law.  Under Louisiana law, a parolee is required to "refrain from engaging in criminal conduct" "as a condition of his parole." La. Rev. State. Ann. 15:574.4.2(A)(1).  Further, as already explained *supra*:

> [A parolee's] reduced expectation of privacy allows for warrantless searches of his … residence by a probation or parole officer who has reasonable suspicion to believe the person is engaging in criminal activity, with "reasonable suspicion" meaning more than a hunch, but less than probable cause.  "Reasonable suspicion" requires no more than that the parole officer be able to point to specific and articulable facts that, taken together with rational inferences form those facts, reasonably warrant a belief in the conclusion that a condition of parole has been or is being violated.

Spriggs, 271 So. 3d at 326-27 (citation omitted).

Here, all evidence indicates that Giselson's visit began as nothing more than a routine parole check.  However, during that check, she legitimately discovered in plain view a suspiciously large amount of cash, which petitioner then identified as his winnings from "playing dice."  That statement is undeniably ambiguous; some, but not all, dice games are illegal in Louisiana.[22] However, Giselson inferred the statement to be a reference to criminal activity, i.e. **illegal**

---

[21] State v. Dimes, 195 So. 3d 1263, 1273 (La. App. 4th Cir. 2016); State Rec., Vol. 4 of 6.
[22] See La. Rev. Stat. Ann. § 14:90.  In his concurrence on direct appeal, Judge Lombard observed: "'[P]laying dice' is street jargon for 'shooting craps,' a legal game in Louisiana casinos.  The defendant lived 2.17 miles and a $1.25 streetcar ride away from Harrah's in New Orleans." Dimes, 195 So. 3d at 1273 (Lombard, J., concurring); State Rec., Vol. 4 of 6.

gambling, and the state courts correctly determined that her inference was a reasonable one under the circumstances. At that point, she then had the "reasonable suspicion" of criminal activity, which was a parole violation, and that "reasonable suspicion" then furnished her with a legal justification to conduct a further search of the residence. Although that search ultimately revealed additional evidence which was later used to prosecute petitioner for his instant crimes, there is no indication that the search was in reality a subterfuge to engage in a criminal investigation.[23]

For these reasons, Giselson's continuation of the search after discovery of the money was legal, and the evidence she discovered was admissible in the instant prosecution. Therefore, any challenge to the court's ruling on the grounds petitioner now suggests would have been meritless. "An attorney's failure to raise a meritless argument ... cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue." United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999); cf. Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."); Smith v. Puckett, 907 F.2d 581, 585 n.6 (5th Cir. 1990) ("Counsel is not deficient for, and prejudice does not issue from, failure to raise a legally meritless claim."). Accordingly, petitioner likewise has not shown that the state court's denial of this ineffective assistance claim was "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

---

[23] Even a parole officer is not allowed to perform a warrantless search for an impermissible purpose, such as using her parole authority "as a subterfuge to help another police agency that desires to conduct a search in connection with a criminal investigation, but lacks probable cause." Spriggs, 271 So. 3d at 327. However, there is no suggestion, much less any evidence, that Giselson's purported visit was in fact a ruse to conduct a criminal investigation (as opposed to a valid parole check).

In summary: To be entitled to relief, petitioner must demonstrate that the state court decision rejecting his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. He has not done so. As a result, this Court, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, should likewise deny relief.

## RECOMMENDATION

It is therefore **RECOMMENDED** the federal application for habeas corpus relief filed by Rory Dimes be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this   22nd   day of June, 2021.

_____
**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**